633 F.2d 1295
 105 L.R.R.M. (BNA) 3458, 90 Lab.Cas. P 12,486
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CONSTRUCTION AND BUILDING MATERIAL TEAMSTERS LOCAL NO. 291,
Affiliated with theInternational Brotherhood of
Teamsters, Chauffeurs, Warehousemen and
Helpers ofAmerica, Respondent.
 No. 79-7320.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 11, 1980.
Decided Dec. 11, 1980.
 
 Jolane Findley, Washington, D.C., for petitioner; Elliott Moore, N.L.R.B., Washington, D.C., on brief.
 Patrick Szymanski, Brundage, Beeson, Tayer & Kovach, San Francisco, Cal., for respondent.
 Application for Enforcement of an Order of the National Labor relations board.
 Before MERRILL and POOLE, Circuit Judges, and BROWN,* District Judge.
 MERRILL, Circuit Judge:
 
 
 1
 The Board has applied for enforcement of its order issued against the respondent union. The Board found the union to have violated § 8(b)(2) and (1) (A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(2) and (1)(A),[1] when it caused employee Edwin White to be discharged by his employer, Kaiser Industries, Sand and Gravel Division, for delinquency in payment of union dues, without first giving White notice of his suspension from membership in the union and an opportunity to restore himself to good standing. The Board's action followed hearing before an Administration Law Judge on a charge of unfair labor practice filed by White.
 
 
 2
 The constitution of the international union with which respondent is affiliated provides in part:
 
 
 3
 "All members paying dues to Local Unions must pay them on or before the last business day of the current month. Any member failing to pay his dues at such time shall not be in good standing for such month * * * Any member who shall be three (3) months in arrears in the payment of dues, fines, assessments or other charges, shall automatically stand suspended at the end of the third (3rd) month, and shall not be entitled to any rights or privileges of membership .... Any member who has been automatically suspended for failure to pay dues shall be under a continuing obligation to pay dues during the period of his suspension. In addition to requiring the payment of delinquent dues, the Local Union may adopt a bylaw provision requiring the payment of a reinitiation fee for entitlement to the rights and privileges of membership. The Local Union may also adopt a bylaw provision granting to the Local Union Executive Board the power to waive on a nondiscriminatory basis the payment of delinquent dues and/or reinitiation fees for good cause shown."
 
 
 4
 The collective bargaining agreement between the union and the employer contains the following union security provision:
 
 
 5
 "Only members in good standing in the Union shall be retained in employment. For the purposes of this Article, 'members in good standing' shall be defined to mean employee members in the Union who tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership. ... Upon written notice from the Union of failure on the part of any individual ... to continue payment of dues to the union, the employer shall discharge said employee."
 
 
 6
 There was no provision for check-off of union dues by the employer.
 
 
 7
 The union has followed the practice of not requesting the discharge of any member covered by a union security agreement unless and until that member has been automatically suspended from membership following three months of arrears in his or her dues payments. Prior to 1968, the union had followed the practice of notifying its members when they were two months delinquent in their dues payments so they could avoid membership suspension and possible discharge from their employment under applicable union security agreements. That practice was abandoned in April, 1968, on the grounds that too many members were taking "unfair" advantage of such notice and that it was unduly burdensome on the clerical staff.
 
 
 8
 Edwin White, a charter member of the union since 1964, had been employed as a driver by Kaiser Industries since 1960. During the last nine years of his employment, he had served as union steward. He had always followed the practice of paying his dues quarterly for the upcoming three-month period, and had never, until this incident, been delinquent in payment. He paid his dues for January, February and March, 1976, in this fashion. The payment for the second quarter, which he ordinarily would have made on or around April 1, was inadvertently missed.[2]
 
 
 9
 On July 1, 1976, when the next quarterly payment was due, White's wife mailed a check to the union, believing it would cover July, August and September. On the same day, notices were sent by the union, acting routinely through a member of its office staff, advising all members who were then three months delinquent that they were automatically suspended from membership. White was one of those so notified. At the same time, notice of their employees' delinquency was given to the employers of the delinquent members, and discharge was requested. Kaiser was one of the employers so notified.
 
 
 10
 When White received notice of his suspension, he believed he had paid his April, May and June dues and that the letter was a mistake. Only when he contacted the union president, who asked him to check his receipt for such payment, did he realize that he had missed the payment for the preceding quarter. White sought a waiver from the union immediately and asked that the July check be applied to the delinquency. His request was rejected by office staff, and the July check was returned.
 
 
 11
 When Kaiser received the notice from the union, the driver supervisor and the manager of transport operations both telephoned the union president to ask whether White would lose his sixteen-year seniority and the attendant rights and benefits. The president indicated that the discharge would have that effect. They asked if there were any way out for White; they were told by the union president that there was not. The following day, the manager of transport operations told White that the company had no alternative but to terminate his employment.
 
 
 12
 White again sought help from the union officers. He paid his delinquent dues and a reinitiation fee of $150, and explained why the oversight had occurred. The union officers told White that they had no objection to his being rehired by the company, but that it would have to be as a new employee at the bottom of the seniority list. They told him that only the union executive board could waive his suspension. When White took his plea for a waiver to the executive board, he was informed:
 
 
 13
 "After considerable deliberation on the merits of the situation, it is the feeling of the Executive Board that it does not have the unilateral authority to alter, modify or change in any manner, the International Constitution or Local By-Laws, nor does it find any circumstances justifying any extraordinary action."[3]
 
 
 14
 White appealed this decision to the joint council of the international union, but was told that since the matter involved enforcement of a collective bargaining agreement, it was not properly a matter for the international. White then filed this charge of unfair labor practice.
 
 
 15
 The Administrative Law Judge heard and credited testimony that on numerous occasions since 1970 union officers had warned delinquents personally of the imminent danger of automatic suspension, and that on some occasions they had requested members' employers to deliver the warnings. Moreover, between 1968 and 1976, the union on thirty-two occasions had reversed suspension for dues delinquency.
 
 
 16
 The Administrative Law Judge took note of the union's fiduciary responsibility to act fairly with its members when union action might jeopardize employment. The judge quoted N.L.R.B. v. Hotel, Motel and Club Employees' Union, Local 568, 320 F.2d 254, 258 (3d Cir. 1963), as follows:
 
 
 17
 "The comprehensive authority vested in the union, as the exclusive agent of the employees, leads inevitably to employee dependence on the labor organization. There necessarily arises out of this dependence a fiduciary duty that the union deal fairly with employees. * * * At the minimum, this duty requires that the union inform the employee of his obligations in order that the employee may take whatever action is necessary to protect his job tenure."
 
 
 18
 See also General Teamsters Local 162 v. N.L.R.B., 568 F.2d 665, 668-69 (9th Cir. 1978).
 
 
 19
 The Administrative Law Judge also quoted from Teamsters Local 122 (August A. Busch & Co.), 203 N.L.R.B. 1041 (1973):
 
 
 20
 " * * * at the very least, before a union may cause a member's discharge from employment because of dues arrearage, it must meet this 'minimum' obligation by giving reasonable notice of the delinquency, including a statement of the precise amount and months for which dues were due, as well as an explanation of the method used in computing such amount * * *."
 
 The Administrative Law Judge concluded:
 
 21
 "I find and conclude the Union violated its fiduciary obligation and Section 8(b)(2) and (1)(A) of the Act by failing to notify White of his loss of good standing membership, its requirements for his restoration of same and a reasonable opportunity to meet such requirements prior to seeking and securing his discharge, notices and opportunity it had afforded his fellow employee-members at the Company and other members."
 
 
 22
 He recommended and ordered that the union cease and desist from:
 
 
 23
 "(a) Attempting to cause or causing the discharge of its members employed by employers with whom the Union has an agreement conditioning their employment on their acquisition and retention of membership in the Union for failure to acquire or maintain good standing membership in the Union unless and until the Union has notified such members of their lack or loss of good standing, the requirements to gain or restore same, has given such members a reasonable opportunity to acquire or regain good standing membership and such members have failed or refused to comply with the requirements; * * * "
 
 
 24
 The Administrative Law Judge's decision was affirmed by the Board.
 
 
 25
 The union protests that it was only going by the book. It points out that White had full knowledge of his responsibility to pay dues and of the consequences of failure to pay: notice of the changes in practice made in 1968 had been given wide publicity, and members had been warned frequently of the consequences of three months' delinquency. The union contends that it has complied fully with all provisions of the Act, the international constitution and the collective bargaining agreement with Kaiser.
 
 
 26
 We agree with the Administrative Law Judge and the Board. The union is perfectly free to discourage delinquent dues payments by imposing sanctions on its members unless those sanctions interfere with a member's employment and his relations with his employer. In that event, the union's fiduciary duty to represent and deal fairly with its members comes into play. The provisions of the Act at issue here, § 8(b)(2) and (1)(A), must be read with this duty in mind.
 
 
 27
 In Conductron Corp., 183 N.L.R.B. 419, 426 (1970), the Board stated:
 
 
 28
 "(T)he extremity of the penalty against the employee for nonpayment of dues requires that it should not be sanctioned unless as a practical matter the union has taken the necessary steps to make certain that a reasonable employee will not fail to meet his membership obligation through ignorance or inadvertence but will do so only as a matter of conscious choice."
 
 
 29
 In our view this is a salutary rule. (The application here of the union's rule was even more severe because when White missed his payment, which the union allowed him to make quarterly, he immediately became delinquent without the "grace" period which would have attended a member who paid each month.) Therefore, we hold that before a union takes the drastic step of causing a member to be discharged from his employment for delinquent dues payments, the union must take whatever steps are necessary to be certain that the delinquency was not due to the member's ignorance or inadvertence.
 
 
 30
 The Board added to the order recommended by the Administrative Law Judge the requirement that the union pay back to White the reinitiation fee paid by him. This portion of the order we decline to enforce. It is by means of this type of sanction that the union can discourage delinquency. We find nothing in the findings of the Administrative Law Judge to suggest that failure to waive reinitiation fee in this case did not comport with past practice. That should, in our view, be the proper standard.
 
 
 31
 With the exception of that part of the order respecting repayment of reinitiation fee, the order of the Board is enforced.
 
 
 
 *
 Honorable Wesley E. Brown, Senior United States District Judge of the District of Kansas, sitting by designation
 
 
 [1]
 29 U.S.C. § 158(b) provides that it shall be an unfair labor practice for a labor organization or its agents:
 "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title * * *.
 (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."
 Section 158(a)(3) provides that it shall be an unfair labor practice for an employer to encourage or discourage membership of an employee in any labor organization by discrimination in regard to hire or employment. A proviso allows for union security agreements and permits an employer to agree with the labor organization representing its employees to require as a condition of employment that the employee shall join the labor organization within thirty days of his or her employment.
 
 
 [2]
 As to the cause for this inadvertence, the Administrative Law Judge stated:
 "White and his family were drawn into a series of traumatic episodes wherein the son of White's brother, who was close to White, was arrested and beaten by police officers, causing severe and permanent injuries to White's nephew, the dismissal or discipline of the officer involved and eventual dismissal of all criminal charges against White's nephew. White and his family became deeply involved both in the series of hearings and trials which occurred as well as the emotional and medical problems of the nephew and his parents."
 
 
 [3]
 No alteration, modification or change in the international constitution or local by-laws would have been required. All that was involved was the local practice of automatically requesting discharge when an automatic suspension occurred